JOHN F. FENTON & another *vs.* QUABOAG COUNTRY CLUB, INC.

Hampden.   November 9, 1967. — January 11, 1968.

Present: WILKINS, C. J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Trespass. Equity Jurisdiction,* Trespass. *Golf Course. Damages,* For trespass.

Facts found by a master in a suit in equity as to golf balls which were hit from the defendant's golf course onto the plaintiffs' abutting land and broke panes of glass in their house and otherwise annoyed them rendered proper the entry of a final decree enjoining the defendant from so operating its course "as to damage the property of the Plaintiffs, or to cause golf balls to be cast upon or propelled upon or against . . . [their] property" [538]; damages were rightly awarded to the plaintiffs for the cost of replacing the glass and for their distress and dis-

comfort over fourteen years during which the trespasses on their land had occurred.  [539]

Upon the granting of an appropriate injunction in equity enjoining a golf club from so operating its course as to damage the abutting property of the plaintiffs by golf balls hit onto it, the plaintiffs, under a prayer for damages, were not entitled to an amount "for loss in the fair market value" of the property because of the existence of a continuing trespass and of a fence erected on the course by the club which "seriously . . . [diminished] the value of the property aesthetically," but were entitled to an amount for the diminution of the rental value of the property while the trespasses continued, without consideration of the fence.  [539]

BILL IN EQUITY filed in the Superior Court on June 2, 1965.

The suit was heard by *Tomasello, J.,* on a master's report.

*Robert J. Moran* for the defendant.

*Samuel L. Thompson* for the plaintiffs.

REARDON, J.  This appeal has to do with the game of golf and in particular with the abilities of certain golfers in the county of Hampden whose alleged transgressions gave rise to a suit.  The plaintiffs, husband and wife, state in their bill that they are the owners of a home in Monson adjoining a golf course operated by the defendant, and after the recitation of a series of grievances seek an injunction designed to terminate the operation of one of the holes in the defendant's nine-hole course, together with damages for injuries to person and property.  The defendant's answer makes certain admissions and acknowledges the existence of a problem.  It further states "that cooperation in the problem the . . . [plaintiffs] have has been one way and although the . . . [plaintiffs] may have had no knowledge of the game of golf when they purchased this property they have certainly, over the years, become somewhat familiar with the game, but rather than be cooperative and understanding of the interest of the Quaboag Country Club, Inc. . . . [have] maintained an inexorable position of antagonism towards the Club and its members, and when suggestions were made to them which were anything less than the complete surrender of the use of the ninth fairway to all intentions and purposes, the . . . [plaintiffs] continued to be dissatisfied."

A master to whom the case was referred filed a report which illuminates the deep antagonisms which spring to life when home and family are threatened by devotees of the great outdoors. We refer to his findings.

In 1952 the plaintiffs, John F. and Miriam E. Fenton, "not familiar with the details of the game of golf," bought their house, garage and land from one Lussier and his wife. The east side of the premises fronted on the Monson-Palmer Road. Otherwise the property was bounded on all sides by land owned by the defendant. The Lussiers had purchased the land from the defendant in 1944 and had, as one may gather from the report, coexisted happily with the golf club, a state of affairs no doubt enhanced by the fact that during their tenure Lussier and his family had sold soft drinks and sandwiches to golfers on the course and thus found no fault when errant golf balls descended upon their property. The club itself had a lengthy history. It opened in 1900 as a six-hole course, and in 1922 expanded to nine holes. "Adjoining the westerly boundary of the . . . [plaintiffs'] land is the . . . [defendant's] ninth fairway. It has occupied this location since before 1927, and even prior to that," as far back as 1900, "the east side of the now ninth fairway . . . [was] the east side of a fairway."

Into this posture, fraught with potential trouble which only a golfer could fully appreciate, came the plaintiffs "not familiar with the details of the game of golf." Any deficiency in their knowledge was soon remedied as they immediately came under the assault of balls "hit onto and over their property." "Except for a few isolated occasions, these balls were not intentionally directed" at the Fenton estate. However, the master has provided us with some chilling statistics which cast grave doubt on the proficiency of the golfers of Hampden County, at least those who were playing the defendant's course. From 1952 an annual average number of 250 balls "were left" on the land of the plaintiffs, save for the year 1960 when a grand total of 320 such deposits were made. Over the years

sixteen panes of glass in the plaintiffs' house were broken, for six of which fractures the plaintiffs have received reimbursement. The cost of such replacements apparently defied inflation and remained constant throughout the years at $3.85 for each new pane. Affairs worsened in 1961 when the defendant added a sand trap "to the northwest corner of the ninth green." Since golfers intent on achieving the green drove from the tee in a southerly direction, they were faced with alternatives. They might aim somewhat to the west and face the sand trap, or they might veer more to the east and face the Fentons. The master inclined to the belief that they were prone to make the latter choice although, as he found, this was not without hazard, for the plaintiff, John F. Fenton collected "all the balls he found on his land and sold them periodically." Continued unbridled hooking and slicing caused further aggravation. Some years back the Fentons were possessed of a German Shepherd dog which developed apprehension at the approach of golfers to the point that they were forced to dispense with his companionship. In his place they acquired a Doberman evidently made of sterner stuff. The dog is still with them notwithstanding that he has been struck by a flying golf ball. On one occasion the male plaintiff himself stopped an airborne ball supposedly directed to the ninth green but winging its way off course. At another time a Fenton family steak cookout was interrupted by a misdirected ball which came to rest "just under the grill." There were additional serious evidences of mutual annoyance. In an episode "after dark, a ball was driven from the . . . [defendant's] fairway directly against the . . . [plaintiffs'] house." In another, a battered ball bearing the greeting "Hi, Johnnie" descended upon the plaintiffs' close. Hostile incidents occurred. One player venturing on the plaintiffs' property to retrieve a ball swung his club first at the Fentons' dog, then raised it at John Fenton, following which, according to the master's report, he "withdrew."

It need not be emphasized that from the year 1952 the plaintiffs were not silent in their suffering, and there was

some talk about a fence. After the commencement of this suit the defendant constructed on its land a fence twenty-four feet high and three feet in from part of the boundary lines on the northern and western sides of the plaintiffs' land. The master states that while this fence has substantially, it has not entirely, abated the problem caused by the rain of golf balls. We are told that the erection of the fence in 1965 was followed by the flight of some eighty-one balls in that year onto the plaintiffs' territory. This somewhat minimized invasion the master terms "a continuing nuisance and trespass." For all of these depredations he assessed damages at $38.50 for those broken panes as yet unreimbursed, and $2,250 "for loss in the fair market value of . . . [the] property" because of the trespasses as well because the fence "seriously diminishes the value of the property aesthetically." He also found damages at $2,600 for disturbance of the plaintiffs' "peace and comfort" for the thirteen years prior to the erection of the unaesthetic fence. He placed a value on the loss of the plaintiffs' peace and comfort since the fence went up at $50.

Following confirmation of the master's report the court entered a final decree enjoining the defendant from so operating its course "as to damage the property of the Plaintiffs, or to cause golf balls to be cast upon or propelled upon or against the property of the Plaintiffs." The failure to employ the technical language peculiar to the game of golf in the decree in no sense muddies its meaning. The damages assessed by the master were awarded in the interlocutory and final decrees.

We have the case on appeals from the decrees.

1. We have no doubts about the propriety of the injunction. The plaintiffs are clearly entitled to an abatement of the trespasses. *Stevens* v. *Rockport Granite Co.* 216 Mass. 486, 489. *Ferriter* v. *Herlihy,* 287 Mass. 138, 141–144. We paraphrase the apt expression of Chief Justice Rugg in the *Stevens* case: "The pertinent inquiry is whether the noise [the invasion of golf balls] materially interferes with the physical comfort of existence, not according to excep-

tionally refined, uncommon, or luxurious habits of living [e.g. golf addiction], but according to the simple tastes and unaffected notions generally prevailing among plain people [nongolfers]. The standard is what ordinary people [again those who eschew golf], acting reasonably, have a right to demand in the way of health and comfort under all the circumstances." Were it not that this court cannot assume the function of a Robert Trent Jones we should make a judicial suggestion that the defendant's burden under the injunction will be considerably eased by shifting the location of the trap to the northeasterly corner of the green on the assumption, and on this the record is silent, that none exists there now.

2. On the damages awarded, the plaintiffs are entitled to the sum of $38.50 for the cost of replacing the glass, and also to the sum of $2,650 awarded them for their distress and discomfort over fourteen years. The master took testimony on the effect on the plaintiffs of their discomfort which was sufficient to enable him to make the award which he did. *Stevens* v. *Rockport Granite Co.* 216 Mass. 486, 493. *Hakkila* v. *Old Colony Broken Stone & Concrete Co.* 264 Mass. 447.

3. There was error, however, in the award of damages based on loss in the fair market value of the property due to what the master found to be a continuing trespass. This was a trespass of such a nature that it might be terminated by appropriate action, which is what the injunction in fact seeks to do. As such the true measure of damages is the loss in rental value of the property while injury continues. *Belkus* v. *Brockton,* 282 Mass. 285, 287–288. *Chesarone* v. *Pinewood Builders, Inc.* 345 Mass. 236, 242, and cases cited. In the assessment of damages the defendant's erection of the fence on its own property can play no part. The interlocutory and final decrees are reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*