JOYCE AMARAL & another[1] *vs.* PETER CUPPELS & another.[2]

No. 04-P-569.

Bristol. March 9, 2005. - July 22, 2005.

Present: GREENBERG, COWIN, & GREEN, JJ.

*Nuisance. Real Property,* Trespass, Nuisance. *Trespass.*

The judge in a civil action erred in denying injunctive relief in favor of the plaintiffs, who established a claim of continuing trespass in suffering the regular and frequent nonpermissive intrusion onto their respective properties of errant golf balls struck by golfers on the defendants' adjacent golf course, where the defendants asserted no claim of right to use, occupy, or propel golf balls onto the plaintiffs' properties, and where the defendants' burden of modifying the ninth hole of the course, from which most of the errant shots originated, did not create a hardship that rose to the level of relieving the defendants of their obligation to eliminate the continuing trespass. [88-93]

CIVIL ACTION commenced in the Superior Court Department on March 21, 2001.

The case was heard by *Robert J. Kane,* J.

*Preston W. Halperin* for the plaintiffs.

*Michael F. Drywa, Jr.,* for the defendants.

GREEN, J. Since 1981, the defendants have owned and operated a private golf course in Rehoboth known as the Middlebrook Country Club (Middlebrook). In the late 1990's, the plaintiffs moved into newly constructed homes adjacent to the ninth hole of the course. After moving into their homes, both plaintiffs discovered that errant golf balls struck by golfers playing the course came onto their properties with alarming frequency, and after unsuccessfully attempting to negotiate a mutually acceptable resolution with the defendants, the plaintiffs

[1]Carol H. Pray.
[2]Lucretia Cuppels.

sought injunctive relief and damages in the Superior Court. After a trial without a jury, a judge of that court concluded that the defendants' operation of the golf course did not support the plaintiffs' nuisance claim, denied the requested relief, and directed entry of judgment dismissing the complaint.[3] Because the recurrent entry by golf balls onto the plaintiffs' properties constitutes a continuing trespass, we conclude that the trial judge erred in denying injunctive relief.[4] See *Hennessy* v. *Boston,* 265 Mass. 559, 561 (1929); *Fenton* v. *Quaboag Country Club, Inc.,* 353 Mass. 534, 538 (1968).

*Background.* There appears to be little dispute concerning the facts. We summarize the trial judge's findings, adding occasional references to undisputed trial testimony where it serves to illustrate or amplify the judge's findings.

Both plaintiffs' homes are within a residential subdivision known as Columbine Estates. The subdivision was developed independently of Middlebrook and is unrelated to it. Amaral purchased her home from the subdivision developer; Pray purchased a lot in the subdivision and constructed her home thereafter.[5]

As noted earlier, Middlebrook is a private golf club that the defendants have owned since 1981. There are 120 members in the club. Approximately 40,000 rounds of golf are played on the course in aggregate during the course of a year. Middlebrook is a nine hole course, and par is thirty-five.

The plaintiffs were aware before purchasing their properties that the properties were adjacent to the ninth hole of the golf course. Both, in fact, had played the Middlebrook course once at some time before their purchase. Amaral is a regular golfer and a member of a golf club in Massachusetts and another in Florida, but is not a member of Middlebrook. Pray does not play golf on a regular basis, but her husband does; like Amaral, Pray's husband is a member of a golf club but is not a member of Middlebrook.

Before she purchased her home, Amaral asked the realtor

---

[3]The judge did not address the plaintiffs' claim of trespass.

[4]The plaintiffs do not assert on appeal that they are entitled to damages, and we accordingly consider any claim for damages waived.

[5]Amaral moved into her home in 1998; Pray moved into her home in 1999.

who showed her the house whether golf balls often came onto the property and was assured it was not a problem. After moving into her home, however, Amaral discovered that golf balls frequently came onto her property, often followed by golfers hoping to retrieve them. To remedy the latter intrusion, Amaral replaced a degraded barbed wire fence with a six foot high chain link fence. That helped deter the entries by golfers, but not their errant shots. During a weekend of good weather in golfing season, up to a dozen balls typically come onto Amaral's property. At trial, Amaral brought with her six plastic buckets, each containing approximately 300 golf balls she had retrieved from her yard during the five years she had occupied her home. Amaral testified that in addition to those 1,800 balls, she had given many others away, and had used others to play herself. Five window screens were damaged by balls that hit her house, and one large window was broken; the defendants reimbursed Amaral for the cost of replacing the window screens but refused her request for the $945 she paid to replace the broken window. Other balls have hit the siding of the house and a deck attached to the rear of the house. One ball landed on the hood of her mother's car while it was parked in Amaral's front driveway, and while Amaral, her mother, and her son were standing nearby; the ball left a dimpled dent in the car's metal hood. On another occasion when Amaral was not home, Pray's husband observed a golf ball strike Amaral's home so hard that it triggered the burglar alarm.

Though no person has yet been struck by a golf ball on Amaral's property, the fear of being struck has a significant effect on Amaral's use and enjoyment of her yard. Amaral restricts her son's use of the yard for play to an area on the side of her house away from the ninth tee. She seldom uses the rear deck. She contracts with a landscaping company for maintenance of her yard; the members of the landscaping crew wear hard hats while working in her yard.

Before constructing their home, the Prays staked out the site of the proposed house on the ground. They decided to relocate the house to a different portion of the lot when they discovered, on a visit to the site, that a significant number of golf balls had accumulated since the preceding day on the ground in the spot

where their bedroom was to be located.[6] Fewer balls come onto Pray's property than onto Amaral's, but the number is nonetheless significant.[7] Despite the preconstruction relocation of their house, one ball struck the side of the Prays' master bedroom. On another occasion, a ball struck Pray's husband while he was on the roof of their home. Balls land with some regularity in the Prays' backyard swimming pool; Pray accordingly requires her two children to wait until after dusk to use the pool.

After the plaintiffs raised concerns with the defendants about the number of golf balls coming onto their properties, the defendants made various adjustments to the ninth hole in an effort to ameliorate the problem. They eliminated one tee location, installed signs instructing golfers to "aim left," planted trees on the right side of the fairway, and allowed the grass along a portion of the right side of the fairway to grow longer. Those changes have decreased the number of balls entering the plaintiffs' properties, but not significantly. The parties discussed installing netting along the side of the course at shared expense, but ultimately abandoned that approach.

*Discussion.* The present case is strikingly similar to *Fenton* v. *Quabog Country Club, Inc.,* 353 Mass. at 536. In *Fenton,* the plaintiffs purchased a home on land abutting a golf course that had been in operation for many years. Errant golf shots deposited an average of 250 balls per year on the plaintiffs' land, with a high of 320 balls during one year. *Ibid.* The report of the case includes description of broken windows, near misses, and one direct hit on one plaintiff over a span of thirteen years preceding the plaintiffs' complaint. *Id.* at 537. The defendant country club erected a twenty-four foot high fence, which reduced but did not eliminate the problem. The court affirmed the master's finding of a continuing trespass, for which an injunction was appropriate. See *id.* at 538.

To a similar effect is *Hennessy* v. *Boston,* 265 Mass. at 560.

---

[6]The Prays sought and obtained a variance to allow the house to be built in the new site.

[7]Though Pray's home is located nearer the ninth tee than is Amaral's, Amaral's property is nearer the ordinary landing distance of a drive off the ninth tee.

In that case, baseballs persistently left the defendant's baseball field and landed on the plaintiff's property, causing damage. *Ibid.* The court held that the acts of the defendant's invitees "were acts of trespass in so far as they were direct invasions of the property; and they were a nuisance, when not a trespass, because the consequence of them was to deprive the plaintiff of the exclusive right to enjoy the use of her premises free from material disturbance and annoyance." *Id.* at 561.

The defendants attempt to distinguish *Fenton* on two grounds. First, the defendants observe that, prior to purchasing the property next to the golf course, the *Fenton* plaintiffs were "not familiar with the details of the game of golf." 353 Mass. at 536. By contrast, the present plaintiffs (or, in the case of Pray, her husband) are experienced and knowledgeable golfers. Second, shortly before suit commenced, the defendant country club in *Fenton* added a sand trap to the hole adjacent to the plaintiffs' property, which exacerbated the problem. See *id.* at 537. By contrast, the defendants contend, they have done nothing to exacerbate the problem and have taken some steps, albeit without particular success, to reduce the number of balls entering upon the plaintiffs' properties. The distinctions are immaterial.

The fact that the defendants have not worsened the condition, and have taken modest steps to correct it, does not pose a particular contrast with the circumstances in *Fenton.* The *Fenton* defendant erected a fence twenty-four feet high in an effort to stop the flight of golf balls onto the plaintiffs' property, a more significant and effective measure than any steps the defendants have taken in the present case. See 353 Mass. at 538. Moreover, in *Fenton,* in describing the facts supporting the plaintiffs' entitlement to injunctive relief, the court reviewed the encroachment of golf balls over the entire period of the plaintiffs' ownership of the abutting property (and not merely of the brief period following placement of the sand trap), and the injunctive order endorsed by the court prohibited the propulsion of golf balls onto the plaintiffs' property, and did not merely require the removal of the recently added sand trap.[8] *Id.* at 538-539.

The fact that the present plaintiffs were more familiar with

---

[8]The court speculated about the possibility that the problem might be alleviated by relocating the sand trap to a different specified location, but it neither

the game of golf than the *Fenton* plaintiffs prior to their respective purchases is similarly unavailing. By invoking the plaintiffs' prior awareness of the risk of encroaching golf balls, the defendants wish us to weigh in their favor the balancing factor, applicable in assessing whether an activity constitutes a private nuisance, of the priority in time as between the party claiming nuisance and the alleged offender. See *Escobar* v. *Continental Baking Co.*, 33 Mass. App. Ct. 104, 109 (1992), quoting from Prosser & Keeton, Torts § 88, at 630 (5th ed. 1984). In common parlance, a plaintiff in such circumstances is sometimes described as "coming to a nuisance." *Id.* at 110. While the factor is not dispositive in deciding whether an activity constitutes a nuisance, see *Pendoley* v. *Ferreira*, 345 Mass. 309, 310 (1963), it weighs heavily in determining whether a plaintiff is entitled to relief. See *Escobar*, *supra* at 110. However, we need not determine whether the various factors applicable to the plaintiffs' nuisance claim weigh in favor of their request for relief because such factors do not affect the right to relief on a claim of trespass.[9] There is, in other words, no cognate notion of "coming to a trespass," and the continuing and frequent invasion of golf balls from the defendants' course onto the plaintiffs' properties, resulting from the ordinary conduct by the defendants' members of the golfing activity for which the defendants intend the course to be used, constitutes a continuing trespass.

According to Prosser, the distinction between the torts of trespass and nuisance is

"that trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an

prescribed that solution nor intimated that it would be a sufficient response for the defendant to reduce the number of intruding golf balls to the number preceding installation of the trap. *Fenton* v. *Quabog Country Club, Inc.*, 353 Mass. at 539.

[9]Though the defendants argue that the plaintiffs did not assert a claim for trespass in the trial court, paragraphs 14 and 15 of the complaint allege as follows:

"14. The intentional physical invasion of the [plaintiffs'] Properties by golf balls hit from Middlebrook constitutes a trespass.

"15. The continuous nature of the trespass poses a serious hazard to anyone on the [plaintiffs'] Properties and interferes with the physical comfort of the

interference with his use and enjoyment of it. The difference is that between walking across his lawn and establishing a bawdy house next door; between felling a tree across his boundary line and keeping him awake at night with the noise of a rolling mill."

Prosser & Keeton, Torts § 87, at 622. The Restatement expresses the distinction in similar terms:

"A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it. . . . A nuisance is an interference with the interest in the private use and enjoyment of the land, and does not require interference with the possession."

Restatement (Second) of Torts § 821D comment d (1979).

That the regular and frequent nonpermissive propulsion of physical objects onto an adjacent property constitutes a continuing trespass is adequately illustrated by *Fenton, supra,* and *Hennessy, supra.* See *Sheppard Envelope Co.* v. *Arcade Malleable Iron Co.,* 335 Mass. 180, 187 (1956). In such circumstances, an injunction prohibiting the continuing trespass is the appropriate remedy. See *Peters* v. *Archambault,* 361 Mass. 91, 92 (1972), citing *Sheppard Envelope Co.* v. *Arcade Malleable Iron Co., supra.*[10]

To the extent that the ordinary use of the defendants' golf course requires land beyond the course boundaries to accommodate the travel of errant shots, it is incumbent on the defendants to acquire either the fee in the additional land itself, or the right to use the additional land for that purpose. The defendants assert no claim of right to use, occupy, or propel golf balls onto the plaintiffs' properties, and we accordingly see no reason why the plaintiffs should be required to suffer such intrusion merely because the defendants commenced operation

plaintiffs."

The record also reveals that the plaintiffs' counsel directed argument to both trespass and nuisance theories in his opening and closing statements at trial.

[10]The defendants do not argue that the present case falls within any of the exceptional circumstances in which an injunction is not warranted. For a discussion of such circumstances, see *Goulding* v. *Cook,* 422 Mass. 276, 277 n.3 (1996).

of the course before the plaintiffs arrived on the scene,[11] or because it would be difficult or burdensome for the defendants to confine their use to the boundaries of their own property. See *Goulding* v. *Cook*, 422 Mass. 276, 278-279 (1996). The record includes the trial testimony of an expert in golf course design, who suggested that the problem of golf balls traveling onto the plaintiffs' properties could be eliminated if the ninth hole were shortened, changing the hole from a par four to a par three. While we decline to direct a particular means by which the defendants must achieve the goal, we observe that the burden of modifying the hole does not in our view rise to the level of hardship indicated by the Restatement as sufficient (accompanied by other extenuating circumstances) to relieve a defendant of the obligation to eliminate a continuing trespass.[12] The classic example of such a case is set forth in the Restatement (Second) of Torts § 941 comment c, at 583:

> "The defendant has recently completed a twenty-story office building on his lot. The work was done by reputable engineers and builders, and they and the defendant all acted in good faith and with reasonable care. It is, however, found that from the tenth floor upward the wall on the plaintiff's side bulges outward and extends over the line. The extent of the encroachment varies at different points, the maximum being four inches."

---

[11]The defendants do not assert that they have acquired prescriptive rights to use the plaintiffs' properties for the deposit of golf balls, and examination of the record reveals that the earliest date in evidence on which the defendants' property was used as a golf course was less than twenty years before the complaint was filed. We express no view on whether frequent and regular propulsion of golf balls from a course onto adjacent land would support a claim of prescriptive rights. Though the golf course use in *Fenton, supra*, appears to have continued for more than twenty years before the complaint in that case, no claim of prescriptive rights appears to have been asserted in that case.

[12]The trial judge's memorandum of decision expressed concern that such a modification would alter the course from a regulation golf course to a course without an identity as either a par three course or a regulation course. We note that the record includes evidence that the course at Quaboag Country Club, as modified following the opinion in *Fenton, supra*, plays to a par of thirty-four. The record here is inconclusive on the question whether alterations to another hole could safely add a stroke to par to make up for any loss resulting from modification of the ninth hole.

The judgment of dismissal is reversed. The case is remanded to the Superior Court for entry of a new judgment, declaring that the projection of golf balls from the defendants' property onto the plaintiffs' properties constitutes a continuing trespass, and enjoining the trespass. We leave for the Superior Court the determination of the precise form of the injunction.

*So ordered.*