Hely, Charles J., J.
*30 A.Introduction
The plaintiffs live in Scituate, about a half-mile from the rifle and pistol ranges at the Scituate Rod & Gun Club. Bullets have struck homes of the plaintiffs four times in a five-year period. The plaintiffs seek injunctive relief against the Club and damages. The plaintiffs have sufficiently shown that the bullets came from the Club. The existing safety conditions at the Club are not adequate to protect the plaintiffs from an unreasonably high risk of injury from further bullet strikes from the Club. The evidence establishes the plaintiffs’ right to injunctive relief and damages under nuisance law principles.
The case was tried before the court without a jury. The fact findings are based on the evidence and the reasonable inferences that the court has drawn from the evidence. The court with counsel also took a view of the Club premises and Heritage Trail.
B.The Four Bullet Strikes on the Connelly, Norton and Sullivan Homes
Between February 23, 2004, and November 6, 2008, there were four bullet strikes on plaintiffs’ homes on Heritage Trail and nearby on Clapp Road. Heritage Trail is a cul-de-sac with about eleven houses.
The plaintiffs Padmini and Christopher Connelly and their children live at 8 Heritage Trail. On February 23, 2004, the Connellys found a bullet on their driveway. Five days after they found the bullet, the Connellys noticed a small dent in one of their garage doors about ten feet from where they found the bullet. The Connelly’s garage is attached to their house as part of a single structure. Their garage doors face north.
About a year and a half later, on September 10, 2005, the Connellys found another bullet on their driveway. The Connellys discovered a new small dent in a garage door a few feet from where they found this bullet. Based on the size, location and timing of the bullets and dents, the court finds that the bullets found in the driveway caused the garage door dents.
The plaintiffs Margaret and Alan Norton and their children live at 17 Heritage Trail. Their house is at the north end of Heritage Trail at the closed end of the cul-de-sac. The Norton house is .54 miles south of the pistol and rifle ranges at the Club. The Norton’s backyard abuts the half-mile of woods between the Norton house and the Club.
On Saturday afternoon, October 25, 2008, Margaret Norton heard guns being fired from the direction of the Club. At about 2:00 p.m., a bullet crashed through the window in the Norton’s laundry room. Margaret Norton and her son Brendan were a few feet from the laundry room when the bullet crashed through the window.
Scituate Police officers came to the house in response to Margaret Norton’s call. Sergeant Bates found a copper jacket nine millimeter bullet under a towel in the laundry room near a bench. There was a fresh damage in the bench that appeared to have been caused by the bullet. The window and screen that the bullet went through is on the back of the Norton house. The window faces north. A straight line between where the bullet hit the bench and the bullet hole in the window pointed upward toward the treetops in the woods between the Norton house and the Club.
After speaking with the Nortons, Sergeant Bates drove over to the Club. There was a pistol shooting contest underway on one of the ranges. One of the shooters was using nine millimeter ammunition. There are two ranges for rifle and pistol shooting at the Club, the fifty-yard range and the hundred-yard range. The two ranges are side-by-side. The direction of fire on both ranges is between south and southwest.
The plaintiffs Monique and Kevin Sullivan live at 154 Clapp Road on the north side of Clapp Road. The Sullivan house is a few houses south of the Connelly house and about two or three houses east of the entrance to Heritage Trail. On November 6, 2008, Monique Sullivan noticed an object embedded in the door frame of the back door of her home. The Sullivan’s back door faces north. A few days later, the Sullivans looked more closely at the object. They realized that it was a bullet. The bullet was about five-and-a-half feet above the door threshold.
Scituate Police Sergeant Michael O’Hara came to the Sullivan home. He identified the bullet as a .22 caliber. The bullet hole in the door frame was at a downward angle, about forty-five degrees. The bullet probably hit the Sullivan’s door frame on an unknown date before November 6. November 6 was the date that Monique Sullivan first noticed the bullet.
C.The Direction from the Club’s Ranges to the Plaintiffs’ Homes and the Nature of the Area Between the Club and the Homes
Shooters on the hundred-yard range and the fifty-yard range at the Club usually fire from a firing line within a shooting shed. On both ranges the direction of fire from the firing line to the standard target area is between south and southwest. This is the “downrange” direction.
The basic firing direction on the two ranges is between south and southwest. This is also the direction from the firing lines to the Norton, Connelly and Sullivan houses. South is 180 degrees. Southwest is 225 degrees. The direction from the ranges to the Norton’s laundry room window is about 220 degrees according to a reliable estimate from one of the investigating police officers. The direction from the ranges to the Connelly garage doors is about 200 degrees. The direction from the ranges to the back of the Sullivan house is between 180 and 200 degrees.
There are many acres of woods south and southwest of the Club between the Club and the plaintiffs’ houses. There is nothing but woods between the Club *31 and the Norton home at the north end of Heritage Trail. The density of the trees in the woods is light to moderate. Many of the trees are a hundred feet or more high.
D. Safety Conditions at the Club for South-Southwest Shots
A bullet fired from a rifle or a pistol with modem ammunition can easily travel a mile or more. A shot’s traveling distance will also depend on the angle of the gun when fired. If the gun is fired at an upward angle up to about forty-five degrees, this will cause the shot to travel much farther than a horizontal shot. As the angle of fire increases beyond about forty-five degrees, the range of travel will tend to decrease.
A twenty-four-foot high earthen berm backstop stands immediately behind the target areas on the Club’s rifle and pistol ranges. For most shots fired from the firing lines, this berm absorbs the discharged bullets and prevents bullets from leaving the range and heading toward Heritage Trail.
The firing line on each range is at the southern edge of a roofed shooting shed. As a safety feature on each range, there is an overhead “no-sky zone” to protect against shots that are fired at too high an angle. The no-sky zone is a series of overhead wooden beams erected to form a pergola or partial roof. This partial roof extends about fifteen feet southward from the firing line on each range. The partial roof is about nine feet high. It looks like a series of ceiling joists in the framing of house under construction. The Exhibit 24 photographs show the no-sky boards on one of the ranges.
The beams in the no-sky zone are two inches wide and ten inches high. The beams run perpendicular to the line of fire. The beams are about six to eight inches apart. If you stand in front of the firing line you can see open sky perpendicularly above in the spaces between the beams.
If an average-height shooter faces downrange from the firing line, the shooter can see no sky between the overhead beams. The standing shooter can also see no sky between the far edge of the no-sky boards and the top of the earthen backstop behind the targets. If a standing shooter shoots at too high an angle, the shot will hit either the backstop or the overhead no-sky boards.
The backstop and the no-sky beams prevent almost all errant shots from the firing line from traveling as far as Heritage Trail.
Sometimes shooters at the Club fire from positions that are downrange from the firing line and downrange from the no-sky boards. A high-angle shot fired from a position downrange of the no-sky boards can pass over the backstop and can travel uninterrupted to Heritage Trail. At times there are pistol shooting events at the Club when the shooters fire from positions that are downrange of the no-sky boards. A pistol shooting event was taking place when the nine millimeter bullet crashed into the Norton house on October 25, 2008. One of the shooters at this event was shooting nine millimeter ammunition. The evidence is unclear on where this shooter was firing from.
Not all shooting at the Club occurs during group shooting activities. Shooters often come to the club and shoot on their own. Although much of the shooting at the Club is from the firing lines, individual shooters, especially pistol shooters, sometimes shoot from positions that are downrange from the no-sky boards and closer to the targets. The no-sky boards do not protect against high shots leaving the range when the shooter is downrange from the no-sky boards.
The no-sky boards also do not protect fully against shots fired from the firing line if the shooter is in a crouched, kneeling or sitting position or if a standing shooter is unusually short. For such shooters, there is a visible open-sky space between the downrange edge of the no-sky boards and the top of the backstop. A high shot by such a shooter can travel under the no-sky boards and over the backstop and reach Heritage Trail.
The taller trees in the woods between the Club and Heritage Trail give some protection against high shots that pass over the backstop. High shots that are not blocked by the no-sky boards can nevertheless reach Heritage Trail if the arc of the shots is sufficient to go over the backstop and over or between the taller trees.
Rifle and pistol shots fired toward targets on the Club’s ranges sometimes strike fixed hard surfaces on the range and ricochet at an upward angle. If the energy loss from the impact is slight enough and if the deflection angle is diagonally upward to the south or southwest, it is possible for a ricochet shot to go over the backstop and trees and reach Heritage Trail. Although it is possible for such a ricochet shot to reach Heritage Trail, it cannot be determined whether that has ever happened.
In addition to physical conditions at the Club, safely rules and practices for shooters can be an important factor in preventing errant shots from leaving the Club premises. The Club is a nonprofit organization that exists primarily for recreational shooting. The Club is active in safety training for shooters. The Club ranges are also used for police training. Club officers and members try to enforce good safety rules and practices. Most shooters at the Club are careful in their safety practices.
The conditions at the Club do not violate any state or local statutes, regulations or bylaws.
E. Plinkers and Hunters
The woods between the Club and the Norton home extends hundreds of yards to the southwest and west of the Club. Some of the wooded acres are conservation land.
*32 Plinkers occasionally fire guns in the woods at cans, tires and similar informal targets (“plinking’j. Occasionally shots are fired by hunters. Shooting is not prohibited in the woods unless the shooter is within 500 feet of a residence or on land that is posted with no trespassing or similar signs.
Nine millimeter ammunition is not commonly used by hunters and plinkers.
F.Findings on the Source of the Bullet Strikes at the Connelly, Norton and Sullivan Homes
It is possible that some of the bullets strikes on the Norton, Connelly and Sullivan houses may have come from shooters in the woods who had nothing to do with the Scituate Rod & Gun Club. Considering the evidence as a whole and reasonable inferences, it is more likely that the bullets that hit the plaintiffs’ homes were fired by shooters at the Club. From the evidence and reasonable inferences, the court finds that the bullets that hit the Norton, Connelly and Sullivan houses were fired from the Club.
G.Applying Nuisance Principles to the Facts of This Case
A nuisance is actionable “when a property owner creates, permits, or maintains a condition or activity on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another.” Morrissey v. New England Deaconess Association-Abundant Life Communities, Inc., 458 Mass. 580, 588 (2010).
In determining whether a defendant’s use of its land amounts to a nuisance, the court considers whether the defendant’s activity is reasonable in the context of the surrounding conditions and circumstances. DeSanctis v. Lynn Water & Sewer Comm’n, 423 Mass. 112, 116 (1996); Trenz v. Norwell, 68 Mass.App.Ct. 271, 275-76 (2007). Two very important considerations are the severity of the potential future harm and the degree of risk or likelihood that serious injury will occur.
“Reasonableness is a question of fact for the [fact finder] whose decision is based on consideration of all the relevant circumstances including the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter.” Trenz, supra. What is reasonable does not depend solely on the character of the defendant’s activity. Instead, it “focuses on the results of the action, the consequent interference with another’s use and enjoyment of his land.” DeSanctis, 423 Mass. at 117; Trenz, 68 Mass.App.Ct. at 276.
Applying these standards, the court finds that the conditions and activities at the Club’s rifle and pistol ranges amounted to a nuisance beginning at the point when a bullet from the Club crashed into the Norton home. Beginning on October 25, 2008, the rifle and pistol shooting conditions at the Club presented an unreasonably high risk of serious injury to persons in the Heritage Trail-Clapp Road residential area. Twelve days later, a bullet was discovered in the Sullivan’s back door frame. Four bullet hits on homes in five years are enough. The plaintiffs are entitled to injunctive relief.
Heritage Trail was a new road and a new development in the mid-1990s. Before that, the area was undeveloped land with a few houses on Clapp Road. Conditions at the Club that might have been reasonable decades ago are no longer reasonable.
Appropriate injunctive relief in this case must permit the Club to make improvements in the safety conditions at the Club that will eliminate an unreasonable risk of injuiy to persons in the Heritage TrailClapp Road neighborhood. The court will issue an injunction that will prohibit rifle and pistol shooting at the Club. The injunction will remain in effect until the Club demonstrates to the court that substantial safety improvements at the Club have eliminated the unreasonable risk of injuiy to persons in the Heritage Trail-Clapp Road neighborhood without increasing the risk of injury to other persons.
Safety improvements in the physical conditions must include substantial improvements in the height and of the earth backstop and in the design, dimensions and effectiveness of the no-sky baffling system on each range. There must also be improvements in rules and operating procedures that regulate the conduct of shooters, especially for shooters who are not law enforcement officers engaged in required training and qualification shooting. If there is to be any rifle or shooting permitted outside of an effective no-sky system, the Club must convince the court that substantial improvements in other conditions and procedures will be sufficient to prevent an unreasonable risk of injuiy to persons in the Heritage Trail-Clapp Road neighborhood.
H.Damages
The unsafe conditions at the Club caused nuisance damages to the plaintiffs by interfering with their use and enjoyment of their homes between October 25, 2008, and Februaiy 5, 2009, the date of the preliminaiy injunction. The court will refer to this period as the damages period. The plaintiffs’ damages were less severe between late October and the beginning of December. In that period the Club voluntarily suspended all shooting activities in response to the plaintiffs’ complaints and meetings with the Scituate Board of Selectmen. In late November or early December 2008, the Club allowed shooting to occur during a training course at the Club. This event increased the plaintiffs’ reasonable safety fears until the preliminaiy injunction prohibited rifle and pistol shooting at the Club.
Apart from nuisance liabiliiy, there is a trespass if the defendant, without license or other lawful basis, caused a dangerous object to enter on the plaintiffs’ *33 property, and the object caused some damage to the plaintiffs’ property or interfered with the plaintiffs’ use and enjoyment of their property. The bullet strikes from the Club into the Norton house and upon the Sullivan houses amounted to trespasses. See Fenton v. Quaboag Country Club, Inc., 353 Mass. 534, 538-39 (1968). The damages amounts stated below for the Nortons and Sullivans include fair damages for nuisance and trespass.
The unsafe conditions reasonably caused all the plaintiffs to fear for the safety of their children and themselves while they were in their homes and yards. This amounts to interference with the plaintiffs’ use and enjoyment of their homes. The Nortons have four children. Their ages in the fall of 2008 were approximately five to fifteen. The fear and harm to the Nortons was greater than with the other plaintiffs because a bullet from the Club crashed into their house while Margaret Norton and her youngest child were in the hallway a few feet away. The fair total damages amount for Margaret and Alan Norton is $6,000.
The unsafe conditions reasonably caused the Connellys and the Sullivans to fear for the safety of their children in their homes and yards during the specified damages period. The Connellys have three children. Their twins were five years old in the fall of2008. Their other child was a few years older. The Sullivan’s two children were approximately fourteen and twelve during the damages period. The fair damages amount for Padmini and Christopher Connelly and for Monique and Kevin Sullivan is $3,000 per couple.
The bullets that hit the Connelly’s garage doors in 2004 and 2005 caused them some concern, but they did not cause any nuisance damages at the time. In February 2006, Christopher Connelly visited the Club to inquire about his concerns. Club representátives pointed out some recent safety improvements in the physical conditions at the Club. The Connellys relied on the Club’s assurances that there were adequate measures in place for the safety of persons living on Heritage Trail. The two small and unrepaired dents in the Connelly’s garage doors were barely noticeable in comparison to the loss of use and enjoyment damages under nuisance law that began on October 25, 2008. Unsafe conditions at the Club did not interfere with the Connelly’s use and enjoyment of their property until a bullet crashed into the Norton’s house on October 25, 2008. The 2004 and 2005 bullet strikes on the Connelly house were admissible circumstantial evidence on the source of the 2008 bullet strikes and on the nature of a continuing harm and risk to all the plaintiffs after the 2008 bullet strikes.[1]
There was no trespass on the property of the plaintiffs other than the Nortons, Connellys and Sullivans.
The other plaintiffs sustained damages in the form of interference with the use and enjoyment of their homes under nuisance principles. The fair nuisance damages amounts are $3,000 per couple for Nicole and Adam Benjamin of 13 Heritage Trail, Anne and Gary Myerson of 25 Heritage Trail, and Elizabeth and David Dupre of 21 Heritage Trail. The fair damages amount is $1,000 for Kirk J. Wolford of 20 Heritage Trail. These plaintiffs reasonably feared for the safety of their children in their homes and yards during the damages period.
The court need not determine whether the evidence proved the plaintiffs’ negligence claim against the Club. If there was negligence by the Club, any damages would be duplicative of the nuisance damages.[2]
I. Order
A judgment will issue with injunctive relief and damages for the plaintiffs.

 An earlier partial summary judgment ruling by the court limited the plaintiffs’ damages to damages that occurred within the three years prior to the filing of the complaint on January 20, 2009. Aside from the partial summary judgment ruling, the court finds from the trial evidence that the plaintiffs sustained no damages from conditions at the Club until October 25, 2008.

 Summary judgment for the Club has previously been ordered on the plaintiffs’ assault count.
With respect to the plaintiffs Stephen and Laurie Scinicariello, the parties entered a stipulation of dismissal.