Wrenn, Daniel M., J.
This matter was the subject of a juiy-waived trial which began on March 20, 2012 and concluded on March 21, 2012. The parties thereafter presented written requests for findings of fact and rulings of law and counsel for both parties presented closing arguments on March 21, 2012.
The evidence in this matter consisted of nineteen exhibits and the testimony consisted of testimony from the plaintiffs Hollis Shore and David Shore, as well as testimony from the defendant’s owner and representative Thomas Brownell, as well as testimony from Frank Schofield and Linda Wetherby.
In addition, Exhibit 19 was the deposition testimony of Richard Pauley the building inspector for the Town of Lancaster during the applicable time frame for purposes of this litigation, that being generally from 2002 through 2009.
The plaintiffs, via an amended complaint, have brought the present civil action in two counts. First, claiming that they are aggrieved persons for purposes of Mass. G.L.c. 40A, such that they are seeking an order that annuls the Lancaster Zoning Board of Appeals decision marked as Exhibit 1-4 being a decision of the Town of Lancaster Board of Appeals that was filed on October 9, 2008. In addition, at Count n of the plaintiffs’ amended complaint, the plaintiffs bring a cause of action based on a claim of private nuisance.
The defendant Hillwinds Family Limited Partnership-Circle B Bam Co.[1] has defended the case asserting that the plaintiffs are not “aggrieved persons” as defined by Mass. G.L.c. 40A and further that the *52 plaintiffs cannot make out a claim for private nuisance.
FINDINGS OF FACT
The plaintiffs, Hollis Shore and David Shore, are husband and wife. The Shores own the property at 498 Neck Road, Lancaster, Massachusetts having moved from a prior residential home in Belmont, Massachusetts to the Lancaster address in 1992. The Shore’s home is a one-story, single-family residence.
The Shore’s residence faces Neck Road with the Shore’s bedroom being on the front of the residence to the left of the home as viewed from Neck Road. Neck Road is an undivided public way originating at Harvard Road near Route 117 and ending on Route 70. Route 117 is a state highway located a short distance north of the Shore’s residence and Route 70, known as Main Street in Lancaster, is also a fairly high volume state roadway which services significant traffic. Route 70 is significantly further from the Shore’s property. Neck Road is a two-way roadway with traffic in both directions and it essentially runs parallel with Harvard Road. Both Harvard Road and Neck Road connect to Route 117 and Route 70 such that each road serves as a cut-through for traffic wishing to go from 117 to Route 70 or vice versa.
As one looks at the Shore’s property at 498 Neck Road to the left of the Shore’s property at 470 Neck Road is a single-family home owned by the Fords which property contains a bam and paddock area for several horses that are housed at the property. Thus, the area where the horses are kept is immediately adjacent to the Shore’s bedroom. In addition, located across the street from the Shore’s property is the driveway or entrance to 489 Neck Road, that being the “premises” in question.
In addition located at 499 Neck Road, directly across the street from the Shore’s properly, is a single-family residence owned by the Wilsons which residence is a direct abutting residence to the premises. In addition, as one looks at the Wilson property from Neck Road to the left of the Wilson property is the Bohegian mansion condos which consist of a single building containing several residential condominiums that at all times relevant to this matter were occupied residencies in the Town of Lancaster.
In addition, Neck Road generally is an. area of Lancaster that is zoned residential; however, in addition to the Circle B business there are several other properties that have business vehicles and activity. By way of example a family known as the Hawkins owned several residential properties on Neck Road and stored construction-type vehicles such as excavators, dump trucks and diesel pick-up trucks on their property using the vehicles on an ongoing and regular basis in order to conduct a construction business. In addition, one of the property owners on Neck Road also owned a septic business with a truck utilized for that purpose stored at the residential property which again was used on a daily and ongoing basis for said business.
The plaintiffs testified that prior to purchasing their Lancaster home in 1992 they came to the Lancaster area, met with several of the neighbors and generally tried to educate themselves as to the nature and character of the neighborhood. In addition, the plaintiffs also testified that from their memory there was no real commercial type activity at the premises being 489 Neck Road from 1992 through 2002 when Circle B took up operation of their business at the premises. I do not credit this testimony, but instead credit the testimony of Frank Schofield. Frank Schofield testified as to the business uses, including vehicular traffic and employee traffic for 489 Neck Road essentially from 1994 through 2005. The historic use of489 Neck Road was that of a commercial business property. The property in fact was “grandfathered” for such use. The general parameters associated with the use were those of a construction business and/or a waste management business having employees of anywhere from eight to ten and a number of commercial vehicles with general commercial operation at the premises from as early as 6:00 a.m. through into the late afternoon, early evening on a Monday through Friday basis. In addition, the vehicle traffic consisted of heavy duty commercial vehicles such as 18 wheeler tractor-trailer trucks, flatbed tractor-trailer trucks, dump trucks and other vehicles consistent with construction and/or waste management business activity. Frank Schofield presented as a credible witness who had no bias toward either the plaintiffs or defendant in this case.
In 2002 Thomas Brownell, the owner and operator of Circle B Barn Co., entered into a lease for 489 Neck Road in order to conduct his then business activities. Circle B at that time was a business that had three primary and essential business functions. First, Circle B manufactured barn packages, second Circle B ran a fence post business and third, Circle B employed carpentry crews whose purpose was to assemble the manufactured bam packages on site for Circle B’s customers. Mr. Brownell, to his credit, was and is a competent and hardworking business man who pays very close attention to his business activities such that his business thrived from 2002 through 2005 that being the period that Circle B leased the subject property. In addition, as a good business man, Mr. Brownell on behalf of Circle B over a time period from 2002 through the present has maintained a close watch on his business models and has reacted to various changes in the economic climate all to the benefit of his business activities.
Specifically, from 2002 through 2005, Circle B increased its business activity and volume. However, as evidenced by Exhibit 1-1, the March 7, 2005 letter by Richard Pauley, Circle B’s business activity as of that time frame was within the pre-existing business *53 uses, that is, it was a continued use that was grandfathered as a business operation consistent with the prior business operations at the property as of that time. In addition, I find that there were no complaints of any substantial type that were lodged as to Circle B’s business activities for the period 2002 through 2005 and I find specifically as to that time frame that Circle B’s use of the property for business purposes was within the specified historic business uses that were grandfathered by the Town of Lancaster.
In addition, in the summer of 2006, Circle B obtained a building permit in order to build a structure at the 489 Neck Road property which consisted of a building that was 120 feet wide by 60 feet long and 14 feet in height. This building was used as a storage facility for the raw product and the finished bam packages utilized by Circle B which, prior to the construction of this building had simply been stored outdoors. None of the families and/or individuals who resided in the general area of 489 Neck Road voiced any opposition to the construction of this building by Circle B and from 2006 through early 2008 Circle B conducted its business activities with again continued business success and growth of these three component parts of the business model.
At some point in early 2008 the plaintiffs began to complain both to Mr. Brownell and Mr. Pauley about the business activities of Circle B. The primary and overriding complaint related to the amount of vehicle traffic entering and exiting the Circle B driveway. The plaintiffs’ complaints concerned the hours that the vehicles entered and exited the driveway, the type of vehicles, that is, a high number of large 18-wheel tractor-trailer vehicles, and consistent with those complaints, the noise that emanated from the vehicles. In this regard the plaintiffs complained that these vehicles would come as early as three or four in the morning and would, on a regular and ongoing basis, interrupt the sleep of the plaintiffs.
The plaintiff Hollis Shore testified that she is a writer who works a good deal in this activity from her home and keeps some irregular hours due to the fact that she is self-employed and will work a somewhat non-traditional work schedule for her writing activities. In addition, Mrs. Shore is also involved in a retail business activity that also has non-traditional business hours. Mr. Shore works in retail and works essentially an 11:00 a.m. to 8:00 p.m. work schedule, generally on a Monday through Friday basis. Thus, the plaintiffs’ sleep habits are such that they would traditionally sleep until 8:00 or 9:00 a.m. based on their personal and business schedules.
In addition, while the plaintiffs beginning in early 2008 made serious and ongoing complaints about the noise activities associated with the use of the Circle B business as of that time there remained as a general activity in the Neck Road area the typical and usual commercial and residential traffic associated with Neck Road which included commercial vehicles in the form of tractor-trailer trucks, a septic truck and other construction and commercial vehicles which traveled the road on a fairly consistent basis. In addition, located to the rear of the plaintiffs’ property was a commercial train track that had a freight train that would pass by the plaintiffs’ property on a regular basis, but not pursuant to any set schedule. That is, the commercial freight train which was substantial in length and passed at a very slow rate of speed would do so on a weekly basis, sometimes as much as daily and would pass at any time of the day. In addition, when the train did pass it caused substantial noise that could be heard by most, if not all of the neighboring properties, and would in fact at times cause vibration to the plaintiffs’ home. The train also had a whistle that would sound at the various crossings, one of which was in fairly close proximity to the plaintiffs’ home at the north end of Neck Road.
In response to the plaintiffs’ complaint Richard Pauley, the building inspector for the Town of Lancaster, undertook an investigation and review of the Circle B business activities as of that time. This investigation by Mr. Pauley resulted in his issuing a cease and desist order marked as Exhibit 1-3 being a March 20, 2008 letter directed to Circle B advising Circle B that their business activities as of that time had gone beyond the business uses authorized by their grandfather status. Further, I find that as of that time in fact Circle B’s business activities had grown substantially from its initial business activities in the 2002 to 2005 and even into 2006, 2007 time frame. Circle B’s business activities from that March 2008 date continued to increase consistent with its successful business models being the three general areas of business undertaken by Circle B during this time. The high water mark for business activity by Circle B was in the latter part of 2008, that is December of 2008. I find that the defendant Circle B’s level of business activity during this general time frame of early to mid-2008 through the end of 2008 was business activity that was beyond the scope and permitted use as defined by the prior business activities associated with the 489 Neck Road property which activity was grandfathered as a pre-existing established business use.
Circle B, upon receiving the cease and desist order, appealed the building inspector’s action which resulted in public hearings being conducted by the Town of Lancaster Board of Appeals on May 29, June 26 and September 25, 2008. In response to the issues raised during those hearings the defendant Circle B through its owner-operator Thomas Brownell responded and participated in the process of tiying to remediate the issues raised. I find thatThomas Brownell was responsive and genuinely concerned about the issues raised in the town hearing and participated in the process in *54 a good faith manner designed to operate the Circle B business within the confines of the pre-existing business use parameters which had been grandfathered for the property. Circle B ultimately agreed to specific conditions as contained in the Board of Appeal decision that was filed with the town clerk for Lancaster on October 9, 2008, a copy of which was received in evidence as Exhibit 1-4. Circle B, in order to meet the concerns of the Town of Lancaster and in order to bring Circle B’s business within the grandfathered allowable business uses, agreed to items number one through seven which consisted substantially of Circle B agreeing to cease its operation of the fence post portion of its business, as well as providing some improvements to the paving of the driveway to 489 Neck Road, as well as putting in place some limitations as to the tractor-trailer traffic hours, those being limited to 8:00 a.m. through 6:00 p.m. In addition to the items listed at one through seven of the town’s decision Circle B also voluntarily ceased an additional component of its business— that being the employment of carpenters and crews to construct the barn packages for its customers off site.
Thus, Circle B agreed beginning in 2008 into 2009 to make substantial alterations to its business model which resulted in essentially Circle B confining its business activities to the manufacture of barn packages. Thus, as of late 2008 and early 2009 Circle B was a business that conducted the fabrication and construction of barn packages to be sold to customers. However, as of that time frame Circle B agreed to cease operation of its fence post business and no longer employed crews to construct and assemble the barn packages. These concessions by Circle B were substantial and brought Circle B’s business activities within the grandfathered business uses that were and are allowed to be conducted at 489 Neck Road, Lancaster, Massachusetts. I further find that from late 2008 or early 2009 through to the present Circle B has conducted its business operation within the permitted business uses that are grandfathered for that property by the Town of Lancaster. Specifically, while there have been isolated instances when the tractor-trailer traffic has arrived earlier than the 8:00 a.m. time frame, that has been due and owing to conditions outside of the direct control of Circle B. In addition, Circle B has undertaken reasonable efforts to advise its suppliers of the rules and regulations regarding time for delivery, and when Circle B has been advised of a violation of that schedule by its suppliers, Circle B has undertaken reasonable efforts to rectify that circumstance.
The plaintiffs, getting back to their complaints in this matter, essentially assert that the activity of Circle B and the operation of their business has over time impacted on the plaintiffs’ use and quiet enjoyment of their property with specific reference to the plaintiffs being woken regularly from their normal sleep patterns. The plaintiffs have not alleged nor was there any evidence to suggest that the traffic concerns raised by the plaintiffs result in excess congestion of traffic on Neck Road, specifically at the plaintiffs’ property or generally over the course of Neck Road nor have the plaintiffs raised any objection as to safety concerns associated with the traffic issues raised. In addition, the plaintiffs have not introduced any medical evidence to support or even suggest a diagnosable condition or disorder associated with the traffic concerns or the lack of sleep alleged.
RULINGS OF LAW
I. Abutters Appeal Pursuant to Mass. G.L.c. 40A, §17.
The plaintiffs claim they are “aggrieved persons” and therefore have standing to challenge the Town of Lancaster Board of Appeals decision in issue in this case. Pursuant to Mass. G.L.c. 40A, §12, “any person aggrieved by a decision of the Zoning Board of Appeals . . . may appeal ... by bringing an action within twenty days after decision has been filed in the office of the city or town clerk.” An “aggrieved party” is one who “suffers from some infringement of his legal rights.” Marashlian v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721 (1996), citing Circle Lounge & Grill Inc. v. Board of Appeal of Boston, 324 Mass. 427, 430 (1949). As presented in the present action the plaintiffs being landowners directly across the street from the driveway which services 489 Neck Road, Lancaster enjoy a rebuttable presumption that they are persons aggrieved. See, Mass. G.L.c. 40A, §11.
In the present action however the defendants challenge the plaintiffs’ standing and I find that the defendants have offered evidence warranting a finding contrary to the presumed fact in this case. Standerwick v. Zoning Board of Appeals of Andover, 447 Mass. 20 (2006).
The presumption in this case having been rebutted shifts the burden back to the plaintiff to prove standing, which requires the plaintiffs to establish by direct facts and not by speculative opinion that their injury is special and different from the concerns of the rest of the community. Kenner v. Zoning Board of Appeals of Chatham, 459 Mass. 115, 118-19 (2011).
A review of standing based on all the evidence does not require that the factfinder ultimately find that the plaintiffs’ allegations are meritorious for to do so would deny standing after the fact to any unsuccessful plaintiffs. Rather, the plaintiffs must put forth credible evidence to substantiate their allegations such that standing essentially becomes a question of fact for the judge. See, Kenner at 119.
Thus, in order to demonstrate that they are aggrieved under Mass. G.L.c. 40A, the plaintiffs must assert a plausible claim of a definitive violation of a private right, a private properly interest, or a private *55 legal interest, and importantly the right or interest asserted by the plaintiffs claiming aggrievement must be one that Mass. G.L.c. 40A is intended to protect. Standerwick v. Board of Appeals of Andover, 447 Mass. 20 (2006). In the present case I find that the plaintiffs do not have standing as aggrieved parties since their stated concern for the traffic issue raised at the entrance and exit of 489 Neck Road in Lancaster are concerns and issues that are not ones intended for protection by Mass. G.L.c. 40A and/or the by-laws of the Town of Lancaster. Specifically, the plaintiffs have raised concerns personal to them in regard to their sleep being interrupted, but have not raised any issues that would be protected by Mass. G.L.c. 40A such as safety concerns, genuine health issues or traffic issues such as congestion.
II. Private Nuisance
In order for the plaintiffs to recover on a claim of private nuisance they must demonstrate that the defendants improperly created, permitted or maintained a condition or activity that interfered with the plaintiffs’ use and enjoyment of their properly, that the interference was substantial, unreasonable and the defendants had some kind of interest in the property where the nuisance originated. Doe v. New Bedford Housing Authority, 417 Mass. 273 (1994). As outlined above in the findings of fact, I find that the defendants’ use of the property from 2002 through a period in early to mid-2008 was reasonable and consistent with the established pre-existing business use of the property which use was known or knowable by the plaintiffs prior to their purchase of their residential home in 1992. In addition, I further find that from sometime in late 2008 or early 2009 the defendants’ revised and/or modified use of the property was reasonable and likewise within the established prior grandfathered business use of the property such that the Circle B business activity from late 2008 or early 2009 up through and including the date of the trial was a permitted and non-actionable use of the property.
I find however that for a period in the early to mid-part of 2008 through until late 2008 or early 2009 the defendants’ business activity did become a private nuisance, such that the activity had grown to a level that was substantial and unreasonable and beyond the prior permitted business use such that it did interfere with the use and enjoyment of the plaintiffs’ property. Specifically, the interference was for a limited period of time and at regular intervals the plaintiffs’ sleep was interfered with in the early morning hours during this period of offending activity. On a proper showing of independent personal injury, damages for emotional distress caused by a nuisance sometimes may be appropriate. Harrison v. Textron, 367 Mass. 540, 555 n.13 (1975). However, the plaintiffs have offered no medical evidence, no expert opinion, no detailed testimony, and no claims in negligence or strict liability to justify an award of damages. Compare Harrison, 367 Mass. at 555 n.12 (finding insufficient evidence where defendants’ activity “bothered” plaintiffs and affected their “sense of comfort and well-being”), and Bailey v. Shriberg, 31 Mass.App.Ct. 277, 280 (1991) (finding insufficient evidence in a counterclaim where defendants complained they were “upset,” “uptight,” “disgusted,” “annoyed," “fed up,” “tired,” and “rundown” from plaintiffs loud music and barking dogs), with Hakkila v. Old Colony Broken Stone & Concrete Co., 264 Mass. 447, 449-50 (1928) (finding sufficient evidence where stones from blasting caused plaintiff “constant apprehension” for a year and a physician testified to plaintiffs nervous condition and fear of danger), Fenton v. Quaboag Country Club, Inc., 353 Mass. 534, 536-39 (1968) (finding sufficient evidence where an annual average of 250 golf balls fell onto plaintiffs’ property over a period of 13 years resulting in excessive “distress and discomfort”), and Proulx v. Basbanes, 354 Mass. 559, 562 (1968) (finding sufficient evidence where “deafening” vibrations damaged plaintiffs’ home, interfered with hearing, and caused nervousness and upset, loss of sleep and weight, and constant medication to reduce plaintiffs’ nervous condition).
However, I find that this interference did not cause the plaintiffs any defined medical problems and while it did interfere with their sleep I find that such an injury is “de minimis.” In addition, I further find that the injury claimed, that is, interference with the plaintiffs’ sleep, is not a compensable personal injury such that no monetary recovery can be had by the plaintiffs in this action.
ORDER
Upon the foregoing findings of fact and rulings of law the Court orders as follows:
(1) As concerns the plaintiffs’ claim under Mass. G.L.c. 40A the Court finds in favor of the defendants and orders that Count I of the plaintiffs’ complaint be dismissed.
(2) As concerns the plaintiffs’ claim for private nuisance the Court finds in favor of the defendants and ordered that Count II of the plaintiffs’ complaint be dismissed.

 Hillwinds Family Limited Partnership and Circle B Bam Co. will be used interchangeably in this decision. Circle B is the corporate entity that runs the business and the Limited Partnership is the entity that owns the property. However, for practical purposes relevant to this lawsuit from 2002 through the present there is no real practical distinction between the two entities since the Limited Partnership’s purpose is only to purchase the property and then lease the property to Circle B so that the business activity may be carried on.